UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK          FOR ONLINE PUBLICATION ONLY

-------------------------------------------------------------------- X
RICHARD WIDMAYER,                                :
                                                 :
                              Plaintiff,         :
                                                 :          MEMORANDUM
           - against -                           :          AND ORDER
                                                 :
JO ANNE BARNHART,                                :          05 CV 3889
COMMISSIONER OF SOCIAL SECURITY,                 :
                                                 :
                              Defendants.        :
-------------------------------------------------------------------- X

A P P E A R A N C E S :

        CHRISTOPHER D. LAMB
               The Legal Aid Society
               60 Bay Street
               Staten Island, New York  10301
               Attorney for Plaintiff

        ROSLYNN MAUSKOPF
               United States Attorney
               Eastern District of New York
        By:    Keisha-Ann Gray
               Assistant United States Attorney
               Attorney for Defendant

JOHN GLEESON, United States District Judge:

        Richard Widmayer brought this action for review of the decision of the

Commissioner of Social Security denying his claim for a Supplemental Security Income.  The

parties have cross-moved for judgment on the pleadings.  Oral argument was heard on the

motions on June 6, 2006.  Because substantial evidence in the record supports the

Commissioner's finding that Widmayer retains the residual functional capacity to perform

sedentary work, the Commissioner's motion for judgment on the pleadings is granted and

Widmayer's cross-motion is denied.

BACKGROUND

Richard Widmayer injured his back in 1991 while working as an automobile mechanic. He first filed a claim for disability benefits with the Commissioner of Social Security on March 2, 1994. After a hearing, an Administrative Law Judge ("ALJ") denied the claim on October 23, 1996, and the Appeals Council affirmed by order of April 8, 1998. On July 17, 2002, Widmayer brought the instant claim before the Commissioner, alleging he has been disabled since October 24, 1996. Although Widmayer's date last insured of December 31, 1994 renders him ineligible for a Period of Disability and Disability Insurance Benefits, *see* 20 C.F.R. § 404.131, he is still eligible for a Supplemental Security Income if he is "disabled" within the meaning of the Social Security Act. ALJ Newton Greenberg held a hearing on May 26, 2003, and he issued his decision denying Widmayer's claim on January 27, 2003. The Appeals Council denied Widmayer's request for review on November 10, 2005, and this action followed.

A.      Medical Evidence

Widmayer complains principally of pain in his lower back, for which several physicians have examined him.[1] Dr. Harvey Leventhal, a neurosurgeon, examined Widmayer on March 7, 1995, and noted that his "back movements are accompanied by pain but there is no actual restriction in flexion, extension, or lateral rotatory direction .... Straight leg raising is mildly positive on the right. Motor power, sensation, and reflexes plus coordination are intact.

---

[1]      Widmayer also submitted evidence before the Commissioner regarding a heart condition from which he suffers. In his motion for judgment on the pleadings, Widmayer does not take issue with the manner in which the Commissioner evaluated this evidence, and accordingly I do not discuss it here.

There is no asymmetry to visualization of the calves or thighs." A.R. 90.[2] Although Dr.

Leventhal indicated to Widmayer that surgery could improve his condition, Widmayer was not

interested, and Dr. Leventhal was satisfied that "[t]he pain, to direct questioning, [was] not

sufficient to warrant any further evaluation for surgery ...." A.R. 91.

Widmayer had apparently been referred to Dr. Leventhal by Dr. William Head, a

neurologist, who conducted several diagnostic tests on Widmayer in April of 1995. First, Dr.

Head performed a Nerve Conduction Velocity Test ("NCV"), the purpose of which, he

explained, was

> to provide an objective evaluation of the status of the peripheral nerves of both
> lower extremities, including reflex testing of the peripheral nerves with responses
> that are mediated through the spinal cord, to determine changes in both peripheral
> nerves and the proximal portion of the nerve near the spinal cord and nerve roots.

A.R. 84. The test revealed "prolonged bilateral peroneal F waves," which indicated to Dr. Head

"bilateral L4-L5 radiculopathy," that is, compression or irritation of a particular nerve root in the

lower back. Second, Dr. Head performed an electromyogram ("EMG"), the purpose of which

was, similarly, "[t]o provide an objective evaluation of the lumbosacral nerve roots bilaterally, as

well as the function of the lower extremity peripheral nerves and muscles of both legs and the

paralumbar musculature." A.R. 87. The EMG was normal. A.R. 88. Third, Dr. Head ran a

lower extremity Somatosensory Evoked Potential Study ("SSEP"). He did not provide an

explanation for this test, but noted only that Widmayer's results were with the normal limits.

A.R. 92.

In November of 1995, Widmayer was evaluated by Dr. Leonid Slutsky, also a

---

[2]     Citations herein to "A.R." refer to the Administrative Record developed before the Commissioner
and filed by the parties for review.

3

neurologist, who observed that plaintiff had full muscle strength, with good tone, and that sensation in his extremities was grossly intact. A.R. 450-51. Dr. Slutsky found that plaintiff had decreased flexion of the lumbar spine, having lateral flexion to the left of 20 degrees and to the right of 15 degrees.

On April 4, 1997, Dr. Joseph Fulco conducted an orthopedic examination of Widmayer. The plaintiff showed "a full range of motion of the cervical and thoracic spine. In the sitting position he [could] flex the lumbar spine to approximately 20 degrees and in the standing position to approximately 40 degrees. Lateral motion [was] 20 degrees in either direction." A.R. 162. Dr. Fulco found "no tenderness of the spine" on palpation, with "no paraspinal muscle spasm." *Id*. The plaintiff maintained a "full range of motion of the hips, knees, and ankles"; he had "4/5 [motor] strength"; there was no sign of atrophy and no "sensory losses." A.R. 163. Widmayer told Dr. Fulco that he was "able to walk about ½ hour before stopping." A.R. 162. Dr. Fulco accordingly concluded that "[n]o active treatment is necessary at this time after the accident." *Id*.

Widmayer was examined by another neurologist, Dr. Sherwood Jacobson, on January 2, 2002. Dr. Jacobson observed that Widmayer's "[m]uscle tone and strength were within normal limits," and there was "[n]o abnormal movement or significant muscle atrophy." A.R. 191. His "[m]uscle stretch reflexes were all within normal limits," and his gait "presented as slow." *Id*. Dr. Jacobson's "[c]ervical spine examination revealed moderate muscle spasms and tenderness in the upper trapezes muscles, SCM muscles and cervical paraspinal muscles .... All ranges of motion were decreased ...." With respect to the lumbar spine, "there was moderate muscle spasm and tenderness of the lumbar paraspinal muscles .... Ranges of motion were

4

decreased in all ranges. Minor's sign was positive for sciatica. Kemp's test was positive for disc protrusion." In summing up his exam, Dr. Jacobson offered the following commentary:

> Based upon the patient's symptoms and this medical evaluation, further evaluation is needed to determine the complete nature and extent of the pathophysiology involved. Patients who present with neurological complaints and sparse objective findings need neurophysiological and ancillary testings to improve the specificity of the subclinical diagnosis and further define the proper treatment program. Needle EMG and NCV studies are performed to objectively corroborate the diagnosis of nerve injury and to substantiate a neurological deficit. SSEP studies are used to provide information on proximal sensory pathways and differentiate between peripheral and central nervous system lesions which cannot be accessed from NCV or EMG studies. Results of SSEP studies will indicate the extent or absence of peripheral neuropathy and post traumatic demyelination.

A.R. 193. Despite the stated need for further testing -- and apparently with no knowledge of the tests Dr. Head had run -- Dr. Jacobson gave the opinion that "[t]he injuries received as a result of this accident have completely disabled the patient for the present time. There is the possibility that these injuries could become chronic and result in permanent disability." A.R. 194.

On August 2, 2002, Dr. Babu Joseph conducted an "internist examination" of the plaintiff. He observed that Widmayer was "in no acute distress"; his "gait ... [was] normal"; and he had "no difficulty dressing and undressing, or getting on and off the examination table." A.R. 152. Dr. Joseph's spinal exam found "no paraspinal muscle spasm and no tenderness," with forward flexion of 70 degrees and backward flexion of 15 degrees. *Id*. The cervical spine showed a full range of motion. *Id*. Widmayer was "able to stand on toes normally" and exhibited normal muscle strength, with "no muscle wasting." *Id*. Based on these observations, Dr. Joseph concluded that Widmayer could "perform the following work related activities: Walking moderately restricted .... Standing mildly restricted because of low back ache .... [and] sitting no limitation. Carrying, lifting, pulling and pushing moderately restricted ...." A.R. 154.

During this time, Widmayer was also treated by a chiropractor, Dr. Mario Introna, who completed a residual functional capacity evaluation form (undated) at the request of Widmayer's counsel in this case. Dr. Introna indicated that he had treated Widmayer since 1992 for "nerve damage, sciatica, DJD, L3 L4 L5 - S." A.R. 423. In response to the question "Were those conditions documented through MRI, X-ray, CT scan or myelogram?" Dr. Introna checked "Yes," but he failed to respond to the instruction that followed: "Please circle which study was performed and summarize the findings ...." A.R. 423. According to Dr. Introna, Widmayer displayed evidence of muscle spasm, atrophy in his left calf, "motor loss," and "sensory changes." A.R. 425. He again failed to respond to the instruction to "indicate the location of sensory loss and whether it was on pin prick, monofilament testing or vibration." A.R. 425. Dr. Introna indicated that Widmayer had reflex loss; his seated straight leg raising was positive at 25-30 degrees; and supine straight leg raising was positive at 15-20 degrees. Widmayer showed a slight limp, and was not able to do "heel to toe walking." A.R. 426. He showed difficulty getting on an off the examining table and squatting.

Based on these observations, Dr. Introna expressed his opinion that Widmayer "suffer[s] from a condition that could reasonably be expected to produce pain," and that the plaintiff had not "realized pain relief on a sustained basis with medication or other treatment." A.R. 426-27. Dr. Introna further opined that Widmayer could not "stand for 2 hours in the course of an 8 hour day"; that he could not "sit for prolonged periods of time of up to six to eight hours in the course of an eight hour work day"; that he had "problems with walking a short distance; that he would "have to lie down at times during the day to relieve pain; and that he could not lift 10 pounds "at regular intervals in the course of an 8 hour work day." A.R. 429-30.

Dr. Introna responded "Yes" to the question "Have you found evidence of [pain] on EMG or nerve conduction studies?" and that the "date of those studies and the pertinent findings" were "attached." The record on review, however, does not appear to include the results of these tests by Dr. Introna.

B.    Widmayer's Testimony

At the hearing before the ALJ, Widmayer testified as follows on questioning from the ALJ:

> Q:    When's the last time you looked for a job?
>
> A:    I don't know, two years ago.
>
> Q:    What kind of job were you looking for?
>
> A:    Anything.
>
> Q:    Anything. Do you look in the papers now for jobs?
>
> A:    All the time.
>
> ...
>
> Q:    So what would be the job that you could take? I mean you say you're looking for anything ....
>
> A:    Well I was looking in to maybe getting something in security or something.
>
> Q:    Security?
>
> A:    Yeah.
>
> Q:    Well that means moving around a lot, no?
>
> A:    It depends on, I guess it would depend on the type of security it would be, like say if you're like on a --

Q:      Watching TV monitors you mean?

A:      Yeah, something like that.

Q:      ... So you think you could hold down a job of that nature, that's not very exertional, is that right?

A:      Yeah, yes.

A.R. 473-74.

On questioning from his attorney, Widmayer testified that he had to lie down for "[a]bout two hours" during the day, and that he could sit for two hours before experiencing pain. A.R. 474.  He said he could stand for "15 minutes, half hour" before experiencing pain and could walk "[a] block, block and a half."  A.R. 475.  He testified that he could lift and carry only "about five pounds" before experiencing pain.

On a questionnaire, Widmayer reported that he cooks for himself, does his own laundry, does light cleaning, and shops for his own clothes and shoes.  A.R. 61-63.

C.      The ALJ's Decision

The ALJ concluded that although Widmayer's ailments precluded him from performing his past relevant work as an auto mechanic, he could still "perform the full range of sedentary work"; that is, he could sit for "up to a total of six hours, with normal breaks" and "stand or walk for ... up to two hours, with normal breaks, in an eight hour workday"; and he could "carry objects weighing up to 10 pounds on an occasional basis."  A.R. 15.  The ALJ declined to credit Dr. Introna's conclusions because they were "not supported by objective medical findings and ... [were] inconsistent with other physicians' opinion that state that the claimant can still do at least a sedentary job despite his impairments."  A.R. 17.  In denying the

plaintiff's claim, the ALJ noted in particular Widmayer's testimony that "he is currently looking

for a job." A.R. 17.

## DISCUSSION

My review is limited to whether the ALJ's decision that Widmayer is not entitled

to benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Widmayer is entitled to benefits only

if, "by reason of [a] medically determined physical or mental impairment which ... has lasted ...

for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), "he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy ...."

*Id*. at § 423(d)(2)(A).

The Commissioner employs the following five-step analysis in evaluating claims

for disability benefits, *see* 20 C.F.R. § 404.1520 (2005); *Berry*, 675 F.2d at 467, and the same

standards apply to Widmayer's claim for a Supplemental Security Income, *see* 20 C.F.R. §

416.920.

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the Commissioner next considers whether
> the claimant has a severe impairment which significantly limits his physical or
> mental ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix 1 of the regulations. If
> the claimant has such an impairment, the Commissioner will consider him
> disabled without considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is afflicted with a
> "listed" impairment is unable to perform substantial gainful activity. Assuming
> the claimant does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual functional capacity
> to perform his past work. Finally, if the claimant is unable to perform his past

work, the Commissioner then determines whether there is other work which the claimant could perform.  The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final one.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks and citations omitted).

At issue here is the ALJ's decision at the fifth step, and specifically whether Widmayer retains the "residual functional capacity" to perform sedentary work.  According to the Commissioner's vocational rules (the so-called "grids"), a person of Widmayer's age, education, and experience is not disabled if he can perform sedentary work, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, which is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.  The sole question for review is whether the Commissioner's decision that Widmayer could perform sedentary work is supported by substantial evidence in the record.

In that inquiry, a common-sense piece of evidence weighs heavily:  At the hearing before the ALJ, Widmayer indicated that he was in fact looking for a particular type of sedentary job -- monitoring security cameras -- and stated that he thought he could hold down a job of that nature.  Widmayer's own assessment of his capability is especially important given the nature of his injury, as Dr. Jacobson explained:  "Patients" -- and I can only assume he meant patients like Widmayer -- "who present with neurological complaints and sparse objective findings need neurophysiological and ancillary testings to improve the specificity of the subclinical diagnosis

10

and further define the proper treatment program." A.R. 193. The only physician who actually

ran the tests Dr. Jacobson identified as crucial was Dr. Head, but on two of the three tests,

Widmayer's results were normal. In the face of such "sparse objective findings," physicians

often must rely, as Dr. Jacobson himself did, on the patient's own complaints in forming an

opinion about whether the patient's pain is disabling; the question is one of severity.

Widmayer's opinion that even despite his lower back pain he could still perform a job that was

"not very exertional" therefore provides strong support for the Commissioner's decision, which

arrived at the same conclusion.

As recounted above, the preponderance of opinion among Doctors Leventhal,

Slutsky, Fulco, Jacobson, and Joseph was that Widmayer's range of motion remained largely

intact; that the muscle strength in his legs was within normal limits; that there was no muscle

atrophy and no sensory loss; and that there was no paraspinal tenderness or muscle spasm on

palpation. All these findings, as Widmayer points out, are not necessarily inconsistent with a

finding of disability. But taken together with Widmayer's testimony, they provide substantial

evidence to support the Commissioner's conclusion that Widmayer's back pain is not so severe

as to prevent him from performing sedentary work. Indeed, Dr. Leventhal concluded that

Widmayer's "pain, to direct questioning, [was] not sufficient to warrant any further evaluation

for surgery ...." A.R. 91. And Dr. Fulco similarly concluded that "[n]o active treatment is

necessary at this time after the accident." A.R. 162. Had Widmayer been experiencing pain that

was totally disabling, it seems highly doubtful that Doctors Levanthal and Fulco would have been

so willing to discontinue treatment. Rather, their observations are consistent with the

Commissioner's decision that although Widmayer does experience back pain, he is not precluded

from working altogether.

The Commissioner did not owe the contrary opinion of Dr. Introna, a chiropractor, controlling weight. *See* 20 C.F.R. § 416.913(a) (listing "acceptable medical sources" needed to establish an impairment, and not including chiropractors); *Diaz v. Shalala*, 59 F.3d 307, 312-14 (2d Cir. 1995) ("Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide medical opinions.").[3]

CONCLUSION

For the foregoing reasons, I conclude the ALJ's decision was supported by substantial evidence in the record, and, accordingly, the Commissioner's motion for judgment on the pleadings is granted. The Clerk is respectfully directed to close the case.

So ordered.

Dated: Brooklyn, New York
       September 12, 2006

---

[3] For the same reason, and despite Widmayer's urging, I do not consider the opinions of Doctors Pearl and Greenspan, both of whom are chiropractors who examined Widmayer in connection with his worker's compensation claim. A.R. 166, 169.